UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| MARGARET ALLGOOD, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. _____ |
| BAPTIST MEMORIAL MEDICAL GROUP INC. | ) |
| And | ) JURY TRIAL DEMANDED |
| BAPTIST MEMORIAL HEALTH CARE CORPORATION | ) |
| Defendants. | ) |

## COMPLAINT

1. Plaintiff Margaret Allgood ("Plaintiff" or "Allgood") files this Complaint against Defendants Baptist Memorial Medical Group, Inc. ("BMMG"), and Baptist Memorial Health Care Corporation ("BMHCC") for violating 31 U.S.C. § 3730 (h)(1).[1]

## INTRODUCTION

2. Allgood is a licensed nurse practitioner who worked at a cardiovascular care clinic operated by BMMG. In 2018, Allgood learned that Dr. John King, a cardiologist for BMMG, falsely billed for procedures under his name that he did not perform or supervise. Dr. King's false billing violated Medicare reimbursement rules and caused Baptist to submit false claims through Medicare to the Department of Health and Human Services in violation of 31 U.S.C. § 3729 ("the False Claims Act").

---

[1] Because BMMG is a wholly-owned subsidiary of BMHCC, "Baptist" collectively refers to both BMMG and BMHCC.

3.     On October 10, 2018, Allgood reported Dr. King's fraud to Baptist's corporate compliance. On October 12, 2018, Baptist retaliated against Allgood, who was four months pregnant, by (1) falsely accusing her of violating the Health Insurance Portability and Accountability Act ("HIPAA") for accessing medical records to confirm Dr. King's fraud, and (2) immediately suspending her.

4.     Accessing medical records to report fraud internally does not violate HIPAA and is expressly permitted under 45 C.F.R. § 164.506.

5.     After investigating the HIPAA issue for nearly four months, Baptist acknowledged that Dr. King's false billing had caused it to self-report overpayments to the government and agreed to reinstate Allgood at her previous position. However, Baptist refused to acknowledge that Allgood had not violated HIPAA. Despite a demand, Baptist continues to wrongly insist that Allgood violated HIPAA. Baptist's illegal retaliation against Allgood has and continues to cause her reputational harm and emotional distress.

## PARTIES

1.     Plaintiff Allgood is a resident of Columbus, Mississippi, and a licensed nurse practitioner. Since August of 2012, Allgood has worked as a nurse practitioner at a cardiovascular care clinic operated by BMMG in Columbus, Mississippi. The majority of the patients in the clinic are covered by Medicare.

2.     Allgood's duties at BMMG included independently seeing patients to review their medical history and complaints, refill medications, and perform physical exams. Allgood also performed patient rounds at Baptist Memorial Hospital – Golden Triangle in Columbus,

Mississippi. Allgood worked with several doctors at BMMG, including Dr. John King. Allgood also worked with Madelyn King, a nurse practitioner at BMMG and Dr. King's wife.

3. Allgood worked full-time at BMMG until early 2017, when she began working part-time. Before Defendants' retaliation, Allgood received excellent performance reviews throughout her employment. For example, based on cumulative patient surveys, Allgood was recognized as one of the top 5% of providers among doctors and nurse practitioners at all BMMG clinics in 2018.

4. Defendant BMHCC is a non-profit entity incorporated in Tennessee that operates a network of hospitals, medical centers, and specialty facilities throughout the Mid-South. BMHCC's headquarters is located in Memphis, Tennessee.

5. Defendant BMMG is a non-profit entity incorporated in Tennessee and a wholly-owned subsidiary of BMHCC. BMMG operates a multi-specialty physician group practice that manages and develops primary care physicians throughout the Mid-South. BMMG's headquarters is located in Memphis, Tennessee.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction under 28 U.S.C. § 1331, 31 U.S.C. § 3730 (h)(2), and 31 U.S.C. § 3732(a).

7. Venue is appropriate under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).

**LEGAL BACKGROUND**

**I.    MEDICARE REIMBURSEMENT RULES.**

8. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*., establishes Medicare, which is a federally operated and funded program. The United States Department of

Health and Human Services ("HHS") administers Medicare through the Centers for Medicare and Medicaid Services. The Medicare Claims Processing Manual, Chapter 12, Physicians/Nonphysician Practitioners, § 120 provides that: "In general, NPs [nurse practitioners] and CNSs [clinical nurse specialists] are paid for covered services at 80 percent of the lesser of the actual charge or 85 percent of what a physician is paid under the Medicare Physician Fee Schedule." Consistent with this instruction, 42 C.F.R. § 414.56 limits payment for nurse practitioner services to no more 85% of the physician fee schedule.

9. In limited circumstances, Medicare allows physicians to submit claims for "services and supplies" furnished by other employees of a physician, such as nurse practitioners, "incident to" the professional services personally rendered by the physician. 42 C.F.R. § 410.26. This rule allows 100 percent Medicare reimbursement for non-physician services that meet certain requirements.

10. One of the relevant requirements is: "Services and supplies must be furnished in a noninstitutional setting to noninstitutional patients." 42 C.F.R. § 410.26 (b)(1). "Noninstitutional setting means all settings other than a hospital or skilled nursing facility." 42 C.F.R. § 410.26 (a)(6). The other relevant requirement is that: "In general, services and supplies must be furnished under the direct supervision of the physician (or other practitioner)." 42 C.F.R. § 410.26 (b)(5). "Direct supervision means the level of supervision by the physician (or other practitioner) of auxiliary personnel as defined in § 410.32(b)(3)(ii)." 42 C.F.R. § 410.26 (a)(2). Direct supervision requires that: "the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure." 42 C.F.R. § 410.32(b)(3)(ii).

11. As detailed below, Dr. King and Baptist violated the above rules in two different ways. First, Dr. King billed for procedures under his name where nurse practitioners performed the procedures in Baptist's hospitals. Because a hospital does not qualify as a "noninstitutional setting," Medicare's rules required Dr. King and Baptist to bill those procedures under the nurse practitioner's name, not Dr. King's name. Baptist's false Medicare claims caused HHS to overpay Baptist by at least 15% for each such procedure.

12. Second, Dr. King billed for procedures under his name performed at Baptist's clinic by nurse practitioners when Dr. King was not physically present at the clinic. Because "direct supervision" required Dr. King to be physically present, Medicare's rules required Dr. King and Baptist to bill those procedures under the nurse practitioner's name, not Dr. King's name. Baptist's false Medicare claims caused HHS to overpay by at least 15% for each such procedure.

13. As noted in the Medicare Payment Advisory Commission's June 2002 Report To Congress - Medicare Payment to Advanced Practice Nurses and Physician Assistants, at p. 14, noted that: "Paying NPPs [nonphysician practitioners] 85 percent of the fee schedule amount when they bill Medicare directly, but 100 percent of the amount when they bill incident to, raises the potential for inappropriate billing. Examples of such billing include services provided by an NPP billed incident to when the supervising physician was not present in the office or when a patient presented with a new illness and the physician did not see the patient."

## II. THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT.

14. In 1996, Congress passed HIPAA, in part, to "combat waste, fraud and abuse in health insurance." PL 104-191 (HR 3103) (Aug. 21, 1996). Consistent with that purpose, 45

C.F.R. § 164.501 defines "Health care operations" to include: "Conducting or arranging for medical review, legal services, and auditing functions, **including fraud and abuse detection and compliance programs**. . . ." (emphasis added).

15.     45 C.F.R. § 164.506 (c)(1) provides that: "A covered entity may use or disclose protected health information for its own treatment, payment, or **health care operations**." (emphasis added). Further, 45 C.F.R. § 164.502 (j)(1) states that: "A covered entity is not considered to have violated the requirements of this subpart if a member of its workforce or a business associate discloses protected health information, provided that: (i) The workforce member or business associate believes in good faith that the covered entity has engaged in conduct that is unlawful or otherwise violates professional or clinical standards. . . ."

16.     The above rules expressly permit employees of covered entities, like Baptist, to access and use protected health information to report fraud.

## FACTUAL ALLEGATIONS

**I.      ALLGOOD LEARNS OF DR. KING'S FRAUDULENT BILLING.**

17.     On March 28, 2018, Allgood observed Madelyn King, a nurse practitioner employed by BMMG and Dr. King's wife, perform a procedure to remove a heart-monitoring device from a patient of Allgood's at Baptist Memorial Hospital – Golden Triangle. Dr. King was not present in the operating room during this procedure. Allgood had been told that Dr. King would perform this procedure, which she noted in her plan of care for this patient.

18.     On May 17, 2018, Allgood received the "procedure note" for the above operation. A procedure note documents a medical procedure and is added to a patient's chart after a procedure has been completed. The procedure note, signed by Dr. King, falsely stated

that Dr. King performed the procedure and did not mention Madelyn King. Allgood subsequently learned that Baptist billed this procedure under Dr. King's name.

19.   Upon information and belief, the above billing issue was not an isolated incident. Beginning in at least early 2018, Madelyn King performed procedures in Baptist's hospital. Upon information and belief, many of these patients were covered by Medicare. Because a hospital does not qualify as a "non-institutional setting," Medicare rules required Baptist to bill all of these procedures under Madelyn King's name. Allgood's office manager and Baptist employee, Kathy Long ("Long"), told Allgood that Baptist never billed for procedures under Madelyn King's name.

20.   In or around April of 2018, Allgood performed an interrogation on a BMMG clinic patient. An interrogation is a procedure to collect information from devices implanted in hearts, such as pacemakers. Dr. King was not present during this procedure. The nursing staff informed Allgood that BMMG's standard practice was to bill all interrogations under Dr. King's name.

21.   Based on Allgood's previous work at the clinic, she understood that doctors had to be physically present to bill under their name for interrogations. To confirm that understanding, Allgood asked a pacemaker sales representative how to bill for the procedure given Dr. King's absence. The sales representative told Allgood that doctors must be physically present to bill interrogations under their names. Allgood requested that the nursing staff bill the interrogation under her name.

22. After this interrogation, Abby Dichiara ("Dichiara"), a nurse practitioner employed by BMMG who worked with Dr. King, told Allgood that Dr. King was not physically present for the entire pacemaker clinic and frequently came to the clinic late or left early. Despite not being physically present for the entire clinic, Dichiara stated that Dr. King insisted that BMMG bill all pacemaker interrogations performed during the clinic under his name. The majority of the patients in the clinic are covered by Medicare.

23. Allgood told Dichiara this was fraud because the Medicare rules require the physician to be present in the clinic to have interrogations billed under their name and receive 100% reimbursement. Dichiara did not disagree with this statement. After this conversation, Long told Allgood and Dichiara that she was aware of this fraudulent billing practice.

24. On October 2, 2018, Long informed Allgood that Dr. King was upset with Allgood, but she did not know the details. Allgood requested a meeting with Janet Cranford ("Cranford"), director of operations for BMMG, to discuss this issue. On October 4, 2018, Allgood met with Long and Cranford. At this meeting, Cranford reviewed an email from Dr. King listing several complaints about Allgood. Dr. King's primary complaint was that Allgood had accused him of committing fraud with the pacemaker clinic and he could not trust Allgood to see his patients because of this accusation.

25. At the end of the meeting, Cranford told Allgood that the only way to resolve this was for Allgood to speak to Dr. King and "clear this up." Allgood responded that she did not know how to resolve the fraud issue because Dr. King had and may be continuing to commit fraud. Cranford replied that Allgood should have reported the fraud issue to Long and

not discussed it with other staff. Cranford said that Allgood should apologize to Dr. King for telling Dichiara that Dr. King was committing fraud.

26. After this meeting, Long called Allgood to check on her because she had been visibly upset. Allgood asked Long if Dr. King was aware of the above meeting. Long told her that Dr. King knew about the meeting and that "he [Dr. King] is the chief of staff. You know he is paranoid and Janet [Cranford] has to make him happy." Long also told Allgood that she had reported the pacemaker clinic issue to Cranford the week before. According to Long, Cranford said: "he can't do that, that is fraud." According to Long, she told Cranford that "I don't know what you want me to do. I have texted him multiple occasions stating we are seeing patients where are you?" According to Long, Cranford said that "there is nothing we can do about this. [BMMG] is not going to get rid of him [Dr. King]."

## II. ALLGOOD ACCESSES THE RECORDS OF A PATIENT UNDER HER CARE TO INTERNALLY REPORT DR. KING'S FRAUDULENT BILLING.

27. On October 6, 2018, Allgood went to BMMG's clinic to finish pending work because she would not be at the clinic on October 8. After completing her work, Allgood accessed the chart for the patient that had the procedure performed by Madelyn King on March 28, 2018. This patient remained under Allgood's care, and Allgood was the last person to see this patient in the clinic. Further, BMMG's policy allowed nurse practitioners to review the medical records of any clinic patient.

28. Allgood accessed this information because she intended to report Dr. King's fraud, which she did when she returned to work on October 9. Allgood verified that the plan of care for this patient indicated that Dr. King, not Madelyn King, would be performing the

procedure. Allgood also confirmed that Dr. King had written and signed the procedure note, which falsely stated that he had performed the procedure.

### III.    ALLGOOD REPORTS DR. KING'S FRAUD.

29.    On October 9, 2018, Allgood met with Long and told her about Dr. King's fraudulent billing with the procedure in March. Allgood said that she had been too scared to report this incident earlier because she had been told that other employees had been penalized for previously reporting Dr. King's inappropriate conduct. Long accessed the patient's chart and verified that the procedure was billed under Dr. King's name. Long stated that she needed to think about all of this and warned Allgood that if she reported this "they would make hell" for Allgood and her family, and would "try to get rid of you." Long also expressed concern about how the stress might impact Allgood's pregnancy.

30.    Despite accessing the same medical records as Allgood, upon information and belief, Baptist has never accused Long of violating HIPAA, and she has faced no disciplinary action.

31.    On October 10, 2018, Allgood met with Long again. Long said that she had been up all night and had decided that the right thing was to support Allgood and report Dr. King's billing issues. Long said that she was "dreading this" because it was going to be "ugly for everyone." Long again warned Allgood that "they would make life hell" for her and her family and that she was worried about how the stress would impact Allgood's pregnancy.

32.    Long told Allgood that she would report the March procedure billing issue to Cranford because she was her supervisor. Long also instructed Allgood to report the fraud to the BMHCC Tips Hotline. Later that day, Allgood called the Hotline and spoke to Sarah Branch.

Allgood reported Dr. King for, among other issues, fraudulent billing in connection with the procedure in March and the pacemaker clinic. On October 11, 2018, Cheryl Garth ("Garth"), Director of Investigation and Regulatory Compliance, called Allgood and went over what she had reported to Branch. Garth told Allgood to immediately report any retaliation to corporate compliance.

### IV. BAPTIST RETALIATES AGAINST ALLGOOD LESS THAN 48 HOURS AFTER SHE REPORTED DR. KING'S FRAUD TO COMPLIANCE.

33. On October 12, 2018, Allgood met with Amy Pettit ("Pettit"), Director of Human Resources, and her colleague Kimberly Nicholson ("Nicholson"). Allgood explained what she had previously reported to Branch and Garth. When Allgood finished, Nicholson left the room, and Cranford joined the meeting. Cranford stated that she received a report, which indicated that Allgood accessed patient records on October 6, 2018, in violation of HIPAA. Cranford told Allgood that she was immediately suspended and there would be an investigation. If Allgood was cleared, she could return to work; if not, she would be terminated.

34. Allgood asked Cranford to identify the patient records. Cranford refused to provide any information. Cranford did not provide a letter of suspension, indicate if the suspension would be with or without pay, or give Allgood a chance to explain what records she had accessed on October 6.

35. After this meeting, Allgood called Garth, reported her suspension, and stated that this was retaliation. Garth said that she would inform the head of corporate compliance and call her back. Garth never called back.

36. On November 2, 2018, Pettit and Nicholson called Allgood to inform her that she would be paid for her "time off." Allgood said that she understood that her suspension was due to an alleged HIPAA violation and asked why the investigation was taking so long. Pettit responded that there were also issues with billing and compliance that they were looking into. Pettit said that they hoped to be in touch with Allgood by the end of the next week.

37. On November 16, 2018, Pettit and Dee Banta ("Banta"), System Director of Human Resources, called Allgood. Banta asked Allgood why she went to BMMG's clinic on October 6, 2018. Allgood explained that she had taken off work the following Monday and there was work that needed to be completed. Banta then asked why Allgood had pulled up a certain patient's chart that day. Allgood said that she pulled the chart because she had information that Dr. King falsified a report by claiming that he did the procedure when his wife had performed the procedure.

38. Allgood further explained that she wanted to make sure that the report had not changed from the last time she looked at it, and she had the correct dates when she reported the fraud. Allgood said that this was not a HIPAA violation because she was the last person to see the patient in the clinic and that the patient remained under her care. Allgood asked if Banta thought that was a HIPAA violation. Banta responded, "I don't know." Allgood asked if they were investigating anything else. Banta said "no," and they were just trying to wrap up the investigation.

## V.     BAPTIST CONTINUES TO FALSELY ACCUSE ALLGOOD OF VIOLATING HIPAA.

39.     In December 2018, Allgood retained undersigned counsel who had several communications with Baptist's general counsel. The parties were unable to reach a resolution, and Baptist then retained outside counsel.

40.     On February 8, 2019, Baptist, through outside counsel, finally agreed to reinstate Allgood at her same previous position. Because Allgood had a C-section scheduled on March 18, 2019, Baptist placed Allgood on unpaid maternity leave effective March 18, 2019 and agreed that she could be reinstated within 90 days of March 18, 2019. In subsequent communications, Baptist's counsel confirmed that Baptist had self-reported overpayments to the government caused by Dr. King's billing. However, Baptist refused to agree that Allgood had not violated HIPAA.

41.     On April 5, 2019, Allgood's counsel sent a detailed letter to Baptist's counsel demanding that Baptist confirm in writing that Allgood did not violate HIPAA and ensure that her employment records appropriately reflect that she had been cleared of any wrongdoing (attached as Exhibit 1). The letter explained that the medical records that Allgood accessed to confirm Dr. John King's fraud belonged to a patient that remained under Allgood's care, that Allgood's sole reason for accessing these patient records was to allow her to accurately report Dr. King's fraud to her supervisor and Baptist's corporate compliance, and that accessing medical records to report fraud internally is expressly permitted under 45 C.F.R. § 164.506. The letter requested a response within 30 days. Despite several follow up attempts, Baptist has not responded to this letter to date.

42. Baptist's refusal to acknowledge that Allgood did not violate HIPAA demonstrates an ongoing hostility that makes reinstatement impractical and continues to harm her reputation and cause emotional distress.

## COUNT I
### (Retaliation in Violation of 31 U.S.C. § 3730 (h)(1))

43. Plaintiff incorporates all preceding paragraphs.

44. Plaintiff engaged in lawful acts to stop Defendants' violations of 31 U.S.C. § 3729.

45. Defendants knew that Plaintiff engaged in protected activity under 31 U.S.C. § 3730 (h)(1).

46. Defendants suspended Plaintiff's employment, falsely accused her of violating HIPAA, and took other discriminatory actions against Plaintiff because she engaged in protected activity under 31 U.S.C. § 3730 (h)(1).

47. Defendants' retaliation against Plaintiff violated 31 U.S.C. § 3730 (h)(1).

48. Defendants' illegal retaliation has harmed Plaintiff by causing emotional distress and reputational harm.

## PRAYER FOR RELIEF

Plaintiff prays that judgment be entered in her favor against Defendants on Count I as follows:

a. In lieu of reinstatement, front pay in an amount to be proven at trial, plus pre- and post-judgment interest.

b.  Compensation for special damages caused by Defendants' retaliation against Plaintiff in an amount to be proven at trial, including litigation costs and reasonable attorneys' fees, plus pre- and post-judgment interest.

c.  Declaratory judgment that Allgood did not violate HIPAA.

d.  Any further relief that the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands that this case be tried before a jury.

Respectfully submitted,

/s/ Lance Robinson
Lance Robinson (*Pro Hac Vice* pending)
London & Mead
1225 19th Street, NW, Suite 320
Washington, DC 20036
T: (202) 331-3334
F: (202) 785-4280
lrobinson@londonandmead.com


/s/Jonathan P. Lakey
Jonathan P. Lakey (#016788)
Kelly L. Hagy (#036524)
Walk Cook & Lakey, PLC
431 S. Main St, Suite 300
Memphis, TN 38103
T: (901) 260-2575
F: (901) 339-2588
jlakey@walkcook.com
khagy@walkcook.com

*Counsel for Plaintiff Margaret Allgood*

Dated: May 22, 2019