IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| MARGARET ALLGOOD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 19-cv-2323 |
| | ) |
| BAPTIST MEMORIAL MEDICAL | ) |
| GROUP INC. and BAPTIST | ) |
| MEMORIAL HEALTH CARE | ) |
| CORPORATION, | ) |
| | ) |
| Defendants. | |

**ORDER**

This is a retaliation case. Plaintiff Margaret Allgood brings her complaint against Baptist Memorial Medical Group, Inc. ("BMMG") and Baptist Memorial Health Care Corporation ("BMHCC") under the False Claims Act ("FCA"), 31 U.S.C. § 3730(h)(1). (ECF No. 1.) Before the Court are Allgood's Motion for Partial Summary Judgment (ECF No. 146), BMMG's Motion for Summary Judgment (ECF No. 148), and BMHCC's Motion for Summary Judgment. (ECF No. 149.) For the following reasons, the Motions are DENIED.

**I.  Background**

The following facts are undisputed.

BMHCC operates hospitals and medical centers in the Mid-South. (ECF 190 ¶ 1.) BMMG is a wholly owned subsidiary of BMHCC and operates a physician practice group. (Id. ¶ 2.) BMHCC and BMMG are headquartered in Memphis, Tennessee. (Id. ¶¶ 1-2.) In August 2012, BMMG hired Allgood as a full-time nurse practitioner in Memphis, Tennessee (Id. ¶ 3.) In February 2017, Allgood began working part-time. (Id. ¶ 7.)

On March 28, 2018, Allgood observed Madelyn King, a nurse practitioner for BMMG, remove a heart-monitoring device from one of Allgood's patients. (Id. ¶ 10.) Madelyn King was the wife of Dr. John King, a physician with BMMG. (Id.) Dr. King was not in the room during the procedure. (Id. ¶ 11.) In April or May 2018, Allgood reviewed the procedure note, which said that Dr. King had performed the operation. (Id. ¶ 13.) Allgood spoke with her office manager, Kathy Long, who told Allgood that BMMG never billed for procedures under Madelyn King's name. (Id. ¶ 15.)

In April 2018, Allgood performed an interrogation procedure for another patient while Dr. King was not present. (Id. ¶ 17.) Allgood was told that it was standard clinic practice to bill all interrogations under Dr. King's name. (Id. ¶ 18.) Because procedures performed by nurse practitioners were billed under Dr. King's name, the United States Department of Health and Human Services ("HHS") overpaid BMMG for the procedures. (Id. ¶ 21.)

2

On September 20, 2018, Dr. King complained about Allgood to Janet Cranford, Operations Director at BMMG. (ECF No. 188 ¶ 10.) Among his complaints was that Allgood had told another employee that Dr. King had committed billing fraud. (Id.) On October 2, Allgood was told that Dr. King was upset with her. Allgood requested a meeting with Cranford. (ECF No. 190 ¶¶ 23-4.) At the meeting, Cranford suggested that Allgood apologize to Dr. King for claiming he had committed fraud. Allgood refused to apologize. (Id. ¶ 26.)

On October 6, 2018, a Saturday, Allgood went into the BMMG clinic. (Id. ¶ 29.) Allgood was not scheduled to work that day, but she needed to finish her work. An alarm sounded and alerted security when Allgood entered the clinic. (ECF No. 188 ¶ 18.) After finishing her work, Allgood viewed several patient records, including the records of the patient whose procedure had been performed by Madelyn King on March 28, 2018. (ECF No. 190 ¶¶ 33-36.) The records confirmed that Dr. King had written and signed the procedure note, which said that he had performed the procedure, not Madelyn King. (Id.)

On October 9, 2018, Allgood met with Long and told her about the procedure note. (Id. ¶ 39.) On October 10, 2018, Long and Allgood decided that Allgood should report the improper billing through BMMHC's corporate compliance hotline (the "hotline") and that Long would report the billing to Cranford. (Id. ¶¶ 42-43.)

3

Allgood reported Dr. King's billing through the hotline. (Id. ¶ 44.) She also reported that Cranford had suggested that Allgood apologize to Dr. King. (Id. ¶ 45.) Long did not report the billing to Cranford, but told Cranford that Allgood had set off the alarm on October 6. (ECF No. 188 ¶ 22.) Cranford requested an audit of the patient records Allgood had accessed on October 6. (ECF No. 190 ¶ 49.)

On October 11, 2018, Cheryl Garth, Director of Investigations and Regulatory Compliance at BMMG, called Allgood to discuss what Allgood had reported through the hotline. (Id. ¶ 47.) On October 12, 2018, Cranford filed a Privacy and Security Incident Report (the "PSI") against Allgood. (Id. ¶ 50.) The same day, Allgood met with Amy Pettit and Kimberly Nicholson of Human Resources to explain the hotline report. (Id. ¶ 51.) Cranford joined the meeting and told Allgood that she would be suspended immediately pending an investigation into whether she had violated HIPPA or clinic policy while she was in the clinic on October 6. (Id. ¶¶ 53-55.)

On November 2, 2018, BMMHC's Privacy and Security team closed the PSI, concluding: "inapp[ropriate] access not determined. Employee accessed department schedule and looked at patient she is assigned as provider to." (Id. ¶ 81.) On November 16, 2018, Human Resources called Allgood to ask why she went to

4

the clinic on October 6. (Id. ¶ 97.) At some point in late November, the decision was made to reinstate Allgood.

To return to work, a BMMG physician had to proctor Allgood. Robert Vest, BMMG's Chief Operating Officer, met with three physicians during the first two weeks of December 2018. During those meetings, it was decided that Dr. Hemraj Makwana would proctor Allgood. (ECF No. 188. ¶¶ 43-44.) The wife of Paul Prather, counsel for BMMG, passed away shortly after the meetings. (Id. ¶ 48.) On February 8, 2019, BMMG told Allgood that she could return to work after her unpaid maternity leave, which was scheduled to begin on March 18, 2019. (Id. ¶ 55.) Allgood received full pay from October 12, 2018, to March 17, 2019. (Id. ¶ 56.) She began maternity leave on March 18, 2019. (Id.) In May 2019, BMMG investigated Dr. King for behavioral issues. (Id. ¶ 57.) Dr. King and Long were terminated on May 20, 2019. (Id. ¶ 59.)

On May 22, 2019, Allgood filed her complaint, alleging that BMMG and BMHCC had retaliated against her in violation of 31 U.S.C. § 3730(h)(1). (ECF No. 1.) She seeks front pay in lieu of reinstatement, back pay, special damages, and a declaratory judgment that she did not violate HIPAA. On September 20, 2021, BMMG and BMHCC filed their Motions for Summary Judgment, and Allgood filed her Motion for Partial Summary Judgment. (ECF Nos. 147, 148, 149.)

5

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, a court shall grant a party's motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by showing the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of her case. See Fed. R. Civ. P. 56(c)(1); Viet v. Le, 951 F.3d 818, 823 (6th Cir. 2020) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

When confronted with a properly-supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine dispute for trial. See Fed. R. Civ. P. 56(c). "A 'genuine' dispute exists when the plaintiff presents 'significant probative evidence' 'on which a reasonable jury could return a verdict for her.'" EEOC v. Ford Motor Co., 782 F.3d 753, 760 (6th Cir. 2015) (quoting Chappell v. City of Cleveland, 585 F.3d 901, 915 (6th Cir. 2009)). The nonmoving party "must show that there is more than 'some metaphysical doubt as to the material facts.'" Goodman v. J.P. Morgan Inv. Mgmt., Inc., 954 F.3d 852, 859 (6th Cir. 2020) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

A party may not oppose a properly supported summary judgment motion by mere reliance on the pleadings. Celotex Corp., 477 U.S. at 324. Instead, the nonmoving party must adduce concrete evidence on which a reasonable juror could return a verdict in her favor. See Fed. R. Civ. P. 56(c)(1). The Court does not have the duty to search the record for such evidence. See Fed. R. Civ. P. 56(c)(3); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989).

Although summary judgment must be used carefully, it "is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action[,] rather than a disfavored procedural shortcut." FDIC v. Jeff Miller Stables, 573 F.3d 289, 294 (6th Cir. 2009) (quotation marks and citations omitted).

**III. Analysis**

**A. BMHCC's Motion for Summary Judgment**

BMHCC argues that it cannot be held liable under the FCA because it was not Allgood's employer. The FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). "To protect employees who expose fraud against the federal government, the FCA's anti-retaliation provision forbids discharging an employee 'because of lawful acts done . . . in furtherance of an action under'" the FCA.

7

Jones-McNamara v. Holzer Health Sys., 630 F. App'x. 394, 397 (6th Cir. 2015) (quoting 31 U.S.C. § 3730(h)). As originally enacted, the FCA's anti-retaliation provision required employees to bring actions against their actual employers. Vander Boegh v. EnergySolutions, Inc., 772 F.3d 1056, 1062 (6th Cir. 2014). In 2009, Congress expanded the scope of the FCA to allow claims where there was an employment-like relationship. Fraud Enforcement and Recovery Act of 2009, Pub.L. 111-21, 123 Stat. 1617, 1624-25.

The question is whether BMHCC was Allgood's employer or in an employment-like relationship with Allgood. BMHCC managed Allgood's healthcare, life insurance, and retirement benefits. Allgood was subject to BMHCC's policies and procedures, including BMHCC's HIPAA Sanctions Policy. Allgood reported Dr. King's billing fraud through BMHCC's corporate compliance hotline. BMHCC's Corporate Compliance and Privacy and Security teams participated in Allgood's investigation. Allgood's W-2s list BMHCC as her employer.

These facts raise a genuine dispute about whether BMHCC was Allgood's employer or in an employment-like relationship with Allgood. BMHCC's Motion for Summary Judgment is DENIED.

**B. Allgood's Motion for Partial Summary Judgment**

Allgood seeks summary judgment as to liability on her FCA retaliation claim against Baptist.[1] Where a plaintiff proceeds with circumstantial evidence of retaliation, the burden-shifting framework articulated in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973) applies. Jones-McNamara, 630 F. App'x at 398. Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie claim of retaliation. Id. If the plaintiff establishes a prima facie claim, the defendant must produce a legitimate, non-discriminatory reason for the adverse employment action. Id. Once a defendant produces a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretextual. Id.

To establish a prima facie case of retaliation, Allgood must show that (1) she engaged in a protected activity, (2) Baptist knew about the protected activity, and (3) Baptist took an adverse action against her as a result of the protected activity. Yuhasz v. Brush Wellman, Inc., 314 F.3d 559, 566 (6th Cir. 2003).

---

[1] Allgood refers to BMMG and BMHCC collectively as "Baptist" in her Motion for Partial Summary Judgment. BMHCC did not file a response to Allgood's motion, but joins BMMG in the substance of its response in opposition to Allgood's Motion.

9

### 1. Allgood's Protected Activity

In the Sixth Circuit, an employee's investigation into fraud is protected if it "reasonably embod[ies] 'efforts to stop' FCA violations." Jones-McNamara, 630 F. App'x at 399 (quoting 31 U.S.C. § 3730(h)). Employees "must show some linkage between the activities they complain of and fraud on the government." U.S. ex rel. Crockett v. Complete Fitness Rehab., Inc., 721 F. App'x 451, 461 (6th Cir. 2018). The FCA protects employees "while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." U.S. ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 740 (D.C. Cir. 1998) (emphasis in original).

Allgood suspected billing fraud by Dr. King in April 2018. On October 9, 2018, Allgood told Long that she planned to report Dr. King for billing fraud and asked Long if she would support her in making the complaint. On October 10, 2018, Long agreed to support Allgood and told Allgood to report the fraud through the hotline. Allgood reported the alleged billing later that day. Allgood's actions reasonably embody efforts to stop fraud by Dr. King against the HHS. Allgood has established that she engaged in a protected activity.

### 2. Baptist's Knowledge of the Protected Activity

Baptist argues that it did not know of Allgood's protected activity because Allgood did not engage in a protected activity.

10

(ECF No. 191 p. 14) ("Plaintiff has not shown that she engaged in a protected activity under the FCA and, as a result, Defendant was not aware of a claim of fraud against the Government at the time Plaintiff was suspended."). Allgood has established that she engaged in a protected activity. Baptist knew that Allgood was planning to or had reported billing fraud through Allgood's conversations with Long, Cranford, and Garth. Allgood has established that Baptist knew she had engaged in a protected activity.

### 3. Adverse Action

Allgood must show that Baptist took an adverse action against her because she engaged in a protected activity. McKenzie v. BellSouth Telecomms., Inc., 219 F.3d 508, 517 (6th Cir. 2000). That requires a showing of material adversity and causation. See Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595-96 (6th Cir. 2007).

In retaliation contexts, a materially adverse employment action is one that might dissuade a reasonable employee from engaging in the protected conduct. See id. at 596 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Allgood was suspended with pay soon after reporting Dr. King's billing fraud. Her suspension lasted more than four months. Allgood argues that a four-month suspension with pay is an adverse employment action.

11

Baptist argues that Peltier v. United States, 388 F.3d 984 (6th Cir. 2004) and Dedinger v. Ohio, 207 F. App'x 521 (6th Cir. 2006) hold that placement on paid administrative leave pending the outcome of an investigation is not an adverse employment action as a matter of law. Peltier and Dedinger were discrimination cases, not retaliation cases. The definition of an "adverse employment action" is broader in retaliation cases than in discrimination cases. Burlington, 548 U.S. at 67-68; see Rogers v. Henry Ford Health Sys., 897 F.3d 763, 776 (6th Cir. 2018) (the showing of adverse action for a retaliation claim is "less burdensome" than for a discrimination claim). Dedinger, decided after Burlington, acknowledged that its definition of adverse employment action did not apply to retaliation cases. 207 F. App'x at 527 n. 6. Dedinger and Peltier are not dispositive.

The relevant question is whether four months of paid administrative leave would dissuade a reasonable employee from engaging in protected conduct. Allgood cites Rogers and Michael for the proposition that four months paid leave is an adverse action as a matter of law.

In Rogers, the Sixth Circuit decided that a reasonable factfinder could conclude Rogers had suffered a materially adverse employment action. 897 F.3d at 776. Rogers was placed on paid leave for just under a month, escorted out of her office,

12

and referred for a fitness-for-duty exam. Id. Her work email sent out an automated reply that stated she was no longer with her employer. Id. On returning to work, Rogers was given a choice between a severance package and an inferior position at a subsidiary of her employer. Id. The Court held that "[t]he cumulative effect of these actions is sufficient such that a jury could find that they would have dissuaded a reasonable employee from making a charge of discrimination." Id.

In Michael, the Sixth Circuit held that a jury could have found that an employer took a materially adverse action against the employee. See 496 F.3d at 596. The employee was placed a paid two-day leave after engaging in a protected activity. Id. at 591. On returning to work, she was given the choice of staying in her current position and being placed on a 90-day "performance plan" or accepting a lateral assignment to a different position with the same pay and benefits. Id. The employee accepted the first option. Id. The Court found that the paid administrative leave and the 90-day performance plan met Burlington's "relatively low bar." Id. at 584.

In both cases, paid administrative leave was only one part of the adverse action. In Michael, the paid administrative leave lasted two days. Compared to the 90-day performance plan, the administrative leave represented a small part of the total adverse action. In Rogers, the paid administrative leave was a

13

month long, but the Court emphasized the "cumulative effect" of the actions taken against the employee. In both cases, the Sixth Circuit was considering the defendants' motions for summary judgment. It decided that a reasonable jury could, not must, conclude that the employers took materially adverse actions against the employees.

Michael and Rogers do not compel a finding that four months of paid leave is a materially adverse action as a matter of law. A reasonable jury could find that Baptist did not take a materially adverse action against Allgood. Allgood has not established the adverse action element of a prima facie case.

Allgood's Motion for Partial Summary Judgment is DENIED.

**C. BMMG's Motion for Summary Judgment**

BMMG seeks summary judgment on Allgood's retaliation claim and her claims for front pay and back pay.[2]

  1. **The Retaliation Claim**

    a. **Prima Facie Claim**

Allgood has established that she engaged in a protected activity under the FCA and that BMMG knew about the protected activity.

A reasonable jury could conclude that Allgood's suspension was a materially adverse action. Allgood's leave was

---

[2] BMHCC joins in the substance of BMMG's Motion for Summary Judgment.

14

significantly longer than those in Michael and Rogers. In both of those cases, the Sixth Circuit denied the defendants' motions for summary judgment because a reasonable jury could find that the actions taken were materially adverse. See also Moresi v. Potter, 2012 WL 868938, at *12 (W.D. Tenn. Mar. 9, 2012) (finding adverse action where employee given paid three-month administrative leave).

The adverse action must also be "motivated, at least in part, by the employee's engaging in protected activity." McKenzie, 219 F.3d at 514 n. 4. Temporal proximity between the protected activity and retaliation can permit an inference of retaliatory motive. See Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.").

BMGG suspended Allgood less than 48 hours after she reported Dr. King's billing fraud. The temporal proximity raises an inference that BMGG suspended Allgood, at least in part, because of her protected activity.

A reasonable jury could find that Allgood has established a prima facie claim of retaliation.

15

### b. Legitimate, Nondiscriminatory Reason

The burden shifts to BMMG to provide a legitimate, nondiscriminatory reason for its adverse action against Allgood. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).

BMMG argues it had a "legitimate, non-retaliatory reason for suspending [Allgood] while it examined what [Allgood] was doing in the clinic on Saturday, October 6, 2018, and why she was engaged in those otherwise suspicious behaviors." (ECF No. 191 p. 19.) BMMG was concerned that Allgood might have violated HIPAA when accessing patient health records. (ECF No. 146-36 p. 8-9.) BMMG has satisfied its burden of production.

### c. Pretext

For the Court to grant summary judgment, BMMG must show that its proffered reason was not pretextual as a matter of law.

A proffered reason can be pretextual when it (1) has no basis in fact, (2) did not actually motivate the challenged conduct, or (3) was insufficient to warrant the challenged conduct. Michael, 496 F.3d at 597 (internal citations omitted). The Sixth Circuit has "never regarded [these] categories as anything more than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer [take

16

the adverse action] for the stated reason or not?'" Tingle v. Arbors at Hilliard, 692 F.3d 523, 530 (6th Cir. 2012) (quoting Chen v. Dow Chem. Co., 580 F.3d 394, 400 n. 4 (6th Cir. 2009)) (alteration added).

Allgood argues that BMMG's reason is pretextual because Allgood did not violate HIPAA. So long as BMMG "honestly believed" that Allgood might have violated HIPAA, its reason is not pretextual. See Ferrari v. Ford Motor Co., 826 F.3d 885, 897 (6th Cir. 2016). Allgood has provided no evidence that BMMG did not honestly believe that Allgood could have violated HIPAA at the time of the investigation. The HIPAA investigation itself was not pretextual.

Allgood contends that, even if the HIPAA investigation were a legitimate reason for her suspension, it would not explain the length of the suspension. The investigation into Allgood's behavior ended sometime in November. BMMG told Allgood that she could return to work on February 8, 2019.

BMMG explains that this gap occurred because Allgood needed to be proctored by a physician before returning to work. During the first two weeks of December 2018, BMMG met with three cardiologists to determine who would proctor Allgood. After a doctor was determined, Allgood was to return "after the holidays." (ECF No. 190 ¶ 109.) However, the wife of BMMG's

17

primary counsel passed away shortly after the December meetings, which allegedly delayed any communication with Allgood.

A reasonable jury could find that BMMG's proffered reasons for the four-month paid administrative leave, particularly from December to February, are insufficient and pretextual. BMMG's Motion for Summary Judgment on the retaliation claim is DENIED.

### 2. Damages

BMMG contends that Allgood was fully compensated until the day she voluntarily resigned, making back pay and front pay inappropriate.

Relief for retaliatory actions under the FCA includes "2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." § 3730(h)(2). The "provision for special damages under the FCA is broad and, therefore, can include unlisted remedies such as front pay or noneconomic compensatory damages—remedies that are not necessarily restricted to current employees." U.S. ex rel. Felten v. William Beaumont Hosp., 993 F.3d 428, 434 n. 3 (6th Cir. 2021) (citing Hammond v. Northland Counseling Ctr., Inc., 218 F.3d 886, 892 (8th Cir. 2000)).

Front pay is an equitable remedy that is generally awarded "when reinstatement is inappropriate or infeasible." Suggs v. ServiceMaster Educ. Food Mgmt. 72 F.3d 1228, 1234 (6th Cir. 1996)

18

(citing Schwartz v. Gregori, 45 F.3d 1017, 1022 (6th Cir. 1995)). Although reinstatement is the "presumptively favored equitable remedy," reinstatement is not appropriate where "hostility would result." Roush v. KFC Nat. Mgmt. Co., 10 F.3d 392, 398 (6th Cir. 1993); see Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 846 (2001)("In cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers . . . courts have ordered front pay as a substitute for reinstatement.") Similarly, back pay can extend beyond an employee's termination date if the employee was constructively discharged, meaning the "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Smith v. LHC Grp., Inc., 727 F. App'x 100, 104 (6th Cir. 2018) (internal quotations and citations omitted).

Allgood did not return to BMMG after her four-month administrative leave. She argues that returning to BMMG was infeasible because of ongoing workplace hostility stemming from the investigation. Specifically, BMMG "would not put in writing that [Allgood] did not violate HIPAA." (ECF No. 188 p. 22.) Allgood alleges that BMMG's refusal to disclose the results of the investigation was not typical. That BMMG would not clear Allgood's name led her to distrust BMMG.

19

Allgood has put forth sufficient facts to establish a genuine dispute about whether there was ongoing hostility. A reasonable jury could find that it is infeasible for Allgood to return to work at BMMG, that she was constructively discharged, and that she is entitled to front pay and back pay.

BMMG's Motion for Summary Judgment on damages is DENIED.

**IV. Conclusion**

For the foregoing reasons, the Motions for Summary Judgment are DENIED.

SO ORDERED this 2d day of May, 2022.

*/s/ Samuel H. Mays, Jr.*
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE